IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 1:06-CR-161 |
| v. ) | |
| ) | Hon. T.S. Ellis, III |
| VERNON L. JACKSON, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT SUPPLEMENTAL OPPOSITION TO
DEFENDANT VERNON L. JACKSON'S PETITION FOR
WRIT OF *CORAM NOBIS* AND VACATUR OF CONVICTION**

The United States, by and through undersigned counsel, respectfully submits its supplemental opposition to defendant Vernon L. Jackson's ("Jackson's" or "defendant's") petition under 28 U.S.C. § 1651(a) for a writ of *coram nobis* and vacatur of his 2006 convictions for conspiracy to commit bribery, and bribery, entered under the terms of a plea agreement.

**I.    Jackson's Conduct Violated the Federal Bribery Statute in 2006 *and* Post *McDonnell*.**

On May 3, 2006, defendant Jackson appeared before the Court and entered a guilty plea to a two-count Criminal Information charging him with federal bribery and conspiracy to commit federal bribery in violation of 18 U.S.C. §§ 201(b)(1)(A) and 371.[1]  18 U.S.C. § 201(b)(1)(A) provides in pertinent part:

> (b) Whoever—
> (1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, *with intent*—
> (A) to influence any official act; . . .

---
[1] William Jefferson's federal bribery charges emanated from 18 U.S.C. § 201(b)(2)(A).

*Id.* (emphasis added).  As the federal bribery statute indicates, for a bribe payor like Jackson, criminal liability attaches as soon as "*the intent to influence any* official act" is formed and a promise to pay anything of value is made.  *Id.*  In contrast, the public official (payee) must have intended and agreed to *perform* a specific official act, in exchange for the thing of value, in order to be guilty. *See id*. at § 201(b)(2)(A).  As the Eighth Circuit has very recently held, these are "separate subsections laying out different elements for defendants who pay bribes (the payor) and defendants who take bribes (the payee)." *United States v. Suhl*, 885 F.3d 1106, 1111 (8th Cir. 2018).

In *Suhl*, the defendant, a bribe payor who was convicted at trial, appealed, claiming that the indictment (filed pre-*McDonnell*) failed to state an offense because it did not allege an agreement between the payor and payee to perform a specific official act as defined under *McDonnell*.  *Suhl*, 885 F.3d at 1112.  After summarizing the defendant's argument (which is almost identical to the one Jackson makes to this Court), the Eighth Circuit panel rejected it, stating:

> Suhl cites to the language in *McDonnell* wherein the Court explained that "[t]o qualify as an 'official act,' the public official must make a decision or take an action on [a] 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." 136 S.Ct. at 2372. But that passage applied the definition of "official act" to the portion of § 201 dealing with payee defendants. *See* 18 U.S.C. § 201(b)(2)(A) (requiring "performance of any official act"). The portion of § 201 relevant to payors like Suhl requires only an "intent ... to influence any official act." 18 U.S.C. § 201(b)(1)(A).

*Suhl*, 885 F.3d at 1112 (footnote omitted).  The undivided Eighth Circuit panel went on to expressly hold that *McDonnell* did not apply to *bribe payors* charged with substantive counts of violating 18 U.S.C. § 201(b)(1)(A), reasoning that *McDonnell* did not "impose[] a universal requirement that bribe payors and payees have a meeting of the minds about an official act."

*Suhl*, 885 F.3d at 113.  Indeed, "a payor defendant completes the crime[] […] as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement." *Id*.  A jury would be entitled to "conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *McDonnell*, 136 S. Ct. 2355 at 2371.

Other courts have also embraced the *Suhl's* analysis.  For instance, the United States District Court for the Northern District of Alabama recently rejected a *McDonnell* challenge brought by a bribe payor on the basis that the public official had failed to vote or take official action on a specific matter. *See United States v. Gilbert*, 2018 WL 2095853, *6 (N.D. Ala. May 4, 2018) (stating "[t]hat Robinson 'did not vote or does not remember voting on the joint resolution'[ ] is immaterial because [a] payor defendant completes the crime[ ] of honest-services [bribery] as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing.") (*quoting Suhl*, 885 F.3d at 1113).

Likewise, a United States District Judge in Maryland, before the issuance of the Eighth Circuit's opinion in *Suhl*, had independently reached parallel conclusions with respect to a defendant who had bribed an undercover police officer for committing non-existent official acts. *See United States v. Fedorovsky*, 2017 WL 2210251 (D. Md. May 18, 2017).  In *Fedorovsky*, the defendant had pleaded guilty to an Information charging him with violating 18 U.S.C. § 201(b)(1)(A) by agreeing to pay an undercover officer who was posing as a Department of Energy contract specialist, for supposed assistance in obtaining approvals on software contracts. *Fedorovsky*, 2017 WL 2210251 at *1.  In reality, of course, there was no official act, and the undercover officer never performed, or intended to perform, one.  In rejecting the defendant's

motion for bail pending appeal on an actual innocence claim, the district court held that the defendant had failed to raise a substantial question of law. *Id*. at *3. That is because "[t]he statute does not require the accomplishment of an 'official act'; rather it requires only that the defendant act 'with intent to influence any official act." *Id*. (*quoting* 18 U.S.C. § 201(b)(1)(A)). The district court discussed, at length, case law defining liability for bribe payors, none of which was disturbed by *McDonnell*, and which is directly relevant to bribe payors like Jackson:

> "[I]t is immaterial that the bribee does not have the power of decision to accomplish the result which the offeror of the bribe desires." *Hurley v. United States*, 192 F.2d 297, 300 (4th Cir. 1951). Thus, to support a conviction for bribery, it does not matter whether the object of the bribe was attainable, whether the official was corrupted, or even whether the official was aware of the bribe, "so long as the money is offered with corrupt intent." *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980) [citations omitted]
> 
> *United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974) ("The payment and the receipt of the bribe are not interdependent offenses ... Thus the donor may be convicted of giving a bribe despite the fact that the recipient had no intention of altering his official duties, or even lacked the power to do so.")
> 
> *Cf. United States v. Arroyo*, 581 F.2d 649, 655 (7th Cir. 1978) ("Bribes are paid, and solicited, in exchange for what the payer believes he is paying for.... The solicitation ... is the same, whether the yet-to-come impression be objectively true or false.")

*Fedorovsky*, 2017 WL 2210251 at *3. The district court concluded, "[t]hus, Fedorovsky has not established the existence of a substantial question of law regarding whether 18 U.S.C. § 201(b)(1)(A) requires that the bribed public official actually performed, or had the authority to perform, the 'official act' sought by the bribe." *Fedorovsky*, 2017 WL 2210251 at *3

Jackson's petition should fail for the same reasons the defendants in *Suhl* and *Fedorovsky* failed in their motions. Jackson's criminal intent, and corresponding culpability as a bribe payor, were complete when he agreed to pay Jefferson for performing acts that Jackson *perceived* as

tantamount to Jefferson's "ordering a General" to have iGate's product admitted into the U.S. Army's testing facility at Fort Huachuca. It does not matter whether Jackson's perceptions were accurate, whether Jefferson stands convicted or innocent, or whether other witnesses perceived Jefferson's statements to General Hylton differently. What matters is that Jackson agreed to pay a Congressman substantial bribes, through a sham entity, controlled by Jefferson's wife and children, for what Jackson *believed* would be a course of conduct similar to Jefferson's ordering a General around.

The facts contained in this record are straightforward. The Criminal Information alleged, among other things, that:

> . . . [Jefferson] provided official assistance to Jackson in *persuading the U.S. Army to test iGate's broadband two-way technology* and other products which both Jackson and [Jefferson] believed would provide validation to iGate products in U.S. markets for future business. [Jefferson]'s official assistance led to the placement of iGate on the GSA schedule, making iGate products eligible for use in various federal contracts. Ultimately, iGate's products were used by the U.S. Army at Fort Stewart, Georgia.

Dkt. 4, ¶ 2. (emphasis added). But the most accurate and compelling way to learn how Jackson perceived these events is to focus on Jackson's own under oath testimony at the trial of Congressman Jefferson. At Jefferson's trial, the evidence established that Jefferson called General Hylton to his congressional office with Jackson and others present (JA849-53;JA358-59). General Hylton was responsible for managing the annual budget for the Army's communication systems – approximately $1.5 billion. (JA849-53). Jefferson told General Hylton that iGate's product could save the government money and that it needed to get tested at Fort Huachuca (JA359;JA855-60). According to Jackson, "I perceived that he [Jefferson] gave him [General Hylton] instructions, let's get this done. And I perceived the general said, 'Well,

we can make it happen, sir'" (JA359-60).  As expected by Jackson, the Army then asked iGate to send its product to Fort Huachuca (JA362-63;JA859-61).  After Jackson informed Jefferson of the testing's favorable preliminary results, "[Jefferson] informed Jackson that [Jefferson] would not continue to use [Jefferson]'s official position to help Jackson and iGate" unless Jackson agreed to pay a nominee company ostensibly maintained in the names of Jefferson's wife and children.  *See U.S. v. Vernon Jackson*, Criminal No. 1:06CR161, Criminal Information, Dkt. 4, ¶ 3.  *See also* (JA364;JA378-79;GEX15-1).  Congressman Jefferson's conduct with regard to General Hylton provided the only guidepost of what actions Jackson expected Jefferson to perform going forward at the time Jackson agreed to pay the things of value demanded by Jefferson.  Under the case law cited above, it would not matter for Jackson's liability if, in fact Jefferson had no intent to perform any official acts, or was even putting on a show to defraud Jackson.  What does matter is the perception and intent in Jackson's mind when Jackson agreed to pay Jefferson.

Here, again, Jackson's under oath testimony is the only way to accurately adduce what Jackson's intent was at the time Jackson agreed to pay the bribe: "I considered this congressman -- I watched him give orders, if you will, to a United States general. . . I just watched him be so effective for me, and he . . . [had] as much zeal as I did" (JA387-88).  Per Jackson:

> I had been working at this, trying to make this product a successful entry into the telecommunications mainstream for more than ten years. And here this congressman was making things happen in less than a year. He was very, very resourceful, very effective, and very powerful.

(JA387).

Under *McDonnell*, the Supreme Court held that an "official act" need not be the ultimate governmental decision, like passing a law.  It can be a "qualifying step," like narrowing

down the topics for research studies.  *Id*. at 2371.  Similarly, General Hylton's decision to admit iGate's product into the U.S. Army's technology testing program at Fort Huachuca amounted to such a qualifying step.  Indeed, *McDonnell* held that it is enough for the bribed official to "exert pressure on" or "advise" another official to take an official action.[2]  *Id.* at 2370.  While the Supreme Court did not provide additional guidance on what it meant by the phrase to "exert pressure on" another public official, issuing an "order" to a "United States general" must fall squarely within whatever meaning was intended by the Supreme Court.  And that is exactly how defendant Jackson perceived it.

Given defendant Jackson's state of mind on these facts, and the law with respect to criminal liability for bribe payors (as opposed to payees), it would be erroneous to hold that Jackson's criminal liability could only attach upon a subsequent successful performance of an official act by the payee, Congressman Jefferson.  The record presents no doubt as to Jackson's intent at the time of the bribe solicitation; Jackson thought he was paying for a powerful Congressman who could "order" public officials to perform official acts.[3]

---

[2] The Court's Memorandum opinion issued on October 4, 2017 in *U.S. v. Jefferson*, Criminal No. 1:07CR209 ("Mem. Op."), did not provide an analysis of whether Congressman Jefferson's actions amounted to providing "advice" to other public officials.  The government respectfully submits that Congressman Jefferson's actions towards the U.S. Army, the Export Import Bank of the United States, and the U.S. Department of State and other U.S. government agencies with regard to pending visa applications by iGate employees and partners (Dumebi Kachikwu), at a minimum, amounted to Jefferson's providing "advice" to other government officials upon which those public officials would base their decisions to perform official acts.

[3] However, as it relates to the bribe payee, Jefferson, McDonnell requires the government to prove that Jefferson knew that Jackson had such an expectation. 136 S. Ct. at 2371.  In its Mem. Op., the Court noted some conflict between the testimony of General Hylton and defendant Jackson on whether Jefferson "ordered" General Hylton.  *See* Mem. Op. at 29 ("[Jackson's] account is not corroborated by the General's testimony . . .").  However, in the case against Jackson, Jackson's testimony alone establishes Jackson's culpability under the federal bribery statute.  The Court's Mem. Op. also noted that the meeting with General Hylton occurred *before* Jefferson made his bribe solicitation to Jackson.  *Id*. ("even if Jefferson's actions amounted to "pressure," there was no "quo" for the alleged quid pro quo.").  As discussed herein, the crucial analysis in the case against Jackson is Jackson's intent at the time he agreed to Jefferson's bribe solicitation.  In that regard, Jackson's belief that he saw the Congressman "order" a

Additionally, as the government set forth in its Opposition brief, *McDonnell* did not disturb long-standing "stream of benefits," "course of conduct," and "retainer" theories of bribery especially as to bribe payors like Jackson.  Following *McDonnell,* courts continue to hold that implied agreements to perform official acts "as the opportunities arise" violate the federal bribery statute.[4]  *See United States v. Skelos*, 707 Fed. Appx. 733, 738 (2d Cir. Sept. 26, 2017) (*quoting United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) ("Acts constituting the agreement need not be agreed to in advance.  A promise to perform such acts as the opportunities arise is sufficient."); *United States v. Menendez*, 291 F. Supp. 3d 606, 615 *D.N.J. 2018)(*citing United States v. Ganim*, 510 F.3d 134 2d Cir. 2007)("the court in *Ganim* identified the stream of benefits theory as "a natural corollary of *Evans [v. United States* ]' pronouncement that the government need not prove the existence of an explicit agreement at the time a payment is received.").[5]  Jackson aptly summarized his relationship with the congressman: "I believed when I called upon the congressman to help, he would help, because I was paying him to help." (JA469).

---

"U.S. general" is conclusive in determining what Jackson expected from Jefferson going forward, if Jackson agreed to pay the money to Jefferson's designated nominee company.

[4] All that must be shown is that payments were made with the intent of securing a specific *type* of official action in return.  For example, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself, the public official will take specific official actions on the payor's behalf.  *Jennings,* 160 F.3d at 1014. *See also, United States v. Harvey*, 532 F.2d 326, 335 (4th Cir. 2008); *United States v. Baggett,* 481 F.2d 114, 115 (4th Cir. 1973); *United States v. Quinn,* 359 F.3d 666, 673 (4th Cir. 2004); *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976).

[5] Likewise, in denying a *coram nobis* petition based on alleged *McDonnell*-error, the Ninth Circuit endorsed the "implied" quid pro quo theory of liability, holding that the official acts need not be explicitly stated, and further specified that "*McDonnell* did not change the 'linkage' requirement of federal bribery statutes …" *United States v. Malkus*, 696 Fed. Appx. 251, 252 (9th Cir. 2017).

**II.      Jackson's Reliance on the Fourth Circuit's *Mandel* Decision is Misplaced; The Supreme Court's *Bousley* Opinion Requires Jackson to Prove Actual Innocence.**

In his oral argument before the Court, Jackson suggested that Jackson is not required to prove his actual innocence to all criminal conduct in order for his petition to prevail. Jackson cited directly to *United States v. Mandel,* 862 F.2d 1067, 1073 (4th Cir. 1988)("Whatever the rule may be elsewhere, we hold that in a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment.") for this proposition. But Jackson's petition must fail if he cannot establish actual innocence because the *Mandel* decision does not apply to these circumstances.

Ten years after *Mandel* was decided the Supreme Court issued its decision in *Bousley v. United States*, 523 U.S. 614 (1998). The procedural circumstances in *Bousley* mirror those in Jackson's case. Bousley pleaded guilty to drug possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and to "using" a firearm "during and in relation to a drug trafficking crime" in violation of 18 U.S.C. § 941(c)(1). *Id*. Subsequently, the Supreme Court held that the government was required to show "active employment of the firearm," not mere possession for the § 941(c)(1) conviction. *Bailey v. United States*, 516 U.S. 137 (1995). Following *Bailey*, Bousley sought collateral review pursuant to 18 U.S.C. § 2255, claiming that "his plea was not knowing and intelligent" because he was "misinformed by the District Court as to the nature of the charged crime." *Bousley*, 523 U.S. 614 at 616. The Supreme Court held that:

> We have strictly limited the circumstances under which a guilty plea may be attacked on collateral review. "It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked."

*Bousley*, 523 U.S. 614 at 621. This is exactly the same claim that Jackson has made in his petition before this Court – "He did not plead guilty "intelligently," rendering his conviction

constitutionally invalid." Jackson Br. at 7.  However, Jackson's failure to raise such a claim on direct appeal puts him into procedural default.  Claims like Jackson's are disfavored:

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas *only if* the defendant can first demonstrate either "cause" and actual "prejudice," or that he is actually innocent[.] . . . *And even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review.*  Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal. . . Indeed, the concern with finality served by the limitation on collateral attack has *special force with respect to convictions based on guilty pleas.*

*Bousley*, 523 U.S. at 621-22 (internal citations removed.)(emphasis added).   Because Bousley was not able to establish "cause" for his default, the Supreme Court determined that he was required to make a showing that he was "actually innocent."  523 U.S. at 624.  The Supreme Court faulted the district court in that instance, for failing to address the actual innocence of the petitioner and remanded the case to permit the petitioner to make a showing of actual innocence. *Id*.

To the extent Jackson relies on the Fourth Circuit's decision in *Mandel*, the facts of that case are starkly different.  To the extent the two cases cannot be distinguished, *Mandel* has been overturned by the *Bousley* Court.  Jackson has had the opportunity to demonstrate his actual innocence to this Court, but has failed to do so.  As discussed above, Jackson agreed to pay a public official with the intent to influence that public official in the performance of an official act and is guilty under *Suhl* and *Bousley*.

### III.     Jackson's Claim that Federal Rule of Criminal Procedure 11 Provides him Relief is also Misplaced.

Contrary to the defendant's assertion, the government does not "concede error" in the defendant's plea colloquy. It is the defendant who faces—at the very least—the substantial

burden of showing a plain error that effectively rendered the proceeding a miscarriage of justice. For the reasons stated below, Jackson fails.

The Rule 11 plea colloquy does not require a talismanic recitation of all possible defenses and nuances for each crime to which the defendant pleads guilty. *United States v. Cefaratti*, 221 F.3d 502, 508 (3d Cir. 2000) (noting the elements of the offense "need not be recited in any ritualistic fashion" and that Rule 11 is "not to be read requiring a litany or other ritual" (quoting advisory committee note (1983)). A district court is merely required to advise the defendant of "the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G). The court must assure that the plea is knowing and voluntary, Fed. R. Crim. P. 11(b)(2), and supported by a factual basis. Fed. R. Crim. P. 11 (b)(3).

Thus, in evaluating the constitutional validity of a guilty plea, "courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness." *United States v. Moussaoui*, 591 F.3d 263, 278 (4th Cir. 2010), as amended (Feb. 9, 2010) quoting *Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir.2003) (internal citation omitted)). Reviewing courts "accord deference to the trial court's decision as to how best to conduct the mandated colloquy with the defendant." *Moussaoui*, 591 F.3d at 295 (*quoting United States v. DeFusco*, 949 F.2d 114, 116 (4th Cir.1991)).

A defendant who challenges his plea colloquy for the first time on direct appeal must establish (1) error; (2) that was plain; and (3) that affected his substantial rights, i.e., "a reasonable probability that, but for the error, he would not have entered the plea." *Moussaoui*, 591 F.3d at 295 (*quoting United States v. Dominquez Benitez*, 542 U.S. 74, 83 (2004), and citing *United States v. Olano*, 507 U.S. 725, 731-32, (1993)). Even then, the court will not "correct the forfeited error ... unless [it] seriously affect[s] the fairness, integrity or public reputation of

judicial proceedings." *Moussaoui*, 591 F.3d at 295 (*quoting Olano*, 507 U.S. at 731-32). "[A] defendant's admission of guilt in a guilty plea is "so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case." *Moussaoui*, 591 F.3d at 285 (citation omitted).

The record establishes that there was no error in the plea colloquy and that the defendant understood the charges and pleaded guilty knowingly and voluntarily. The Court conducted an extensive plea colloquy of an educated defendant with able counsel. The Court verified that the defendant had read the plea documents and reviewed them with his counsel. The Court made clear also that "you have agreed that the statement of facts that you have signed and made a part of your plea agreement is limited to the facts necessary to support this plea, and that you will provide additional facts in the course of your cooperation." *Id*. at 24. The Court asked the defendant whether he was pleading guilty "freely, willingly, and voluntarily because you are, in fact, guilty," to which the defendant replied, "I am indeed, your Honor." *Id.* at 28. The Court explained the elements of both offenses and that the government, at a trial, would have the burden of proving each element beyond a reasonable doubt to a unanimous jury, and the defendant stated that he understood. *Id*. at 33-37. The Court defined the object of the conspiracy as to "bribe a public official." *Id*. at 35. With respect to the second count, the Court stated that the government would have prove that the defendant "directly or indirectly, gave or offered or promise something of value to a public official for the purpose of influencing a pattern of official acts …" and "in return for a representative's performance of a pattern of official acts with – to support iGate's business endeavors in Africa." *Id*. at 36. The defendant stated he understood and that he had engaged in such conspiracy and bribery. *Id*. at 37.

Defendant Jackson must now realize that he cannot meet the plain error standard, which is why, in his reply brief, he invites this Court to repeat two errors that the Supreme Court reversed in *United States v. Vonn*, 535 U.S. 55 (2002): (1) holding the government to the burden of harmless error review on a Rule 11 collateral attack and (2) confining such inquiry to the plea colloquy, thereby excluding analysis of the bulk of the record.  Unfortunately for the defendant, the Supreme Court has held that Rule 52's plain error standard —and not Rule 11(h)'s harmless error standard—applies to alleged errors in the plea colloquy in situations such as when a defendant fails to object below to a procedural error and later brings a Section 2255 petition. *Vonn*, 535 U.S. at 62-63.  Indeed, the *Vonn* Court held that the adoption of Rule 11(h) had "no effect on the stringent standard[s] for collateral review under 28 U.S.C. § 2255 …" Id. at 63 (*citing United States v. Timreck*, 441 U.S. 780 (1979)).  That a *coram nobis* petition should be treated differently, or as the defendant suggests, much more leniently than a Section 2255 collateral attack, defies logic.

Rather, collateral review standards remain intact, including the defendant's high burden in a *coram nobis* petition. Thus, the defendant at least bears the burden of showing "a complete miscarriage of justice," *Vonn*, 353 U.S. at 64.  This is not dissimilar to the *coram nobis* requirement of showing "an error of the most fundamental character" rendering the proceeding "irregular and invalid" to the point that an innocent man was wrongfully convicted.  Such inquiry necessitates a review of the record beyond the mere plea colloquy in situations—such as here— where the record is more developed than is the case involving a guilty plea of a single defendant who has not testified later at the trial of a co-defendant.  *See Vonn*, 535 U.S. at 74-76 (discussing need for broader review of the record and remanding for same).

When faced with a Rule 11 argument similar to that of Jackson, the Fourth Circuit has followed *Vonn* and held the defendant to a plain error burden on direct appeal. *See United States v. Strassini*, 59 Fed. Appx. 550 (4th Cir. 2003). In *Strassini*, the defendant pleaded guilty to bank and wire fraud, but before his sentencing the Supreme Court, in *Neder v. United States*, 527 U.S. 1 (1999), held that materiality of the false statement or scheme was an essential element of the mail, bank and wire fraud statutes. *Strassini*, 59 Fed. Appx. at 552. Because defendant did not raise a *Neder* objection at his sentencing hearing or otherwise attempt to withdraw his plea at that time, the Fourth Circuit concluded that he was entitled only to plain error review. *Strassini*, 59 Fed. Appx. at 552. Applying plain error review, the Fourth Circuit stated that:

> Strassini must demonstrate that he would not have entered into his plea agreement with the Government and would not have pleaded guilty in his plea hearing if the district court had complied with the requirements of Rule 11 and included the element of materiality in its recitation of the bank and wire fraud charges.

59 Fed. Appx. at 553. Under this analysis, the court considers the benefits to the defendant from the plea agreement and whether the defendant had earlier evidenced a desire to go to trial but for the Rule 11 error. *See Strassini*, 59 Fed. Appx. at 553-54. The court then considers whether the evidence in the entire record shows a miscarriage of justice. *See, e.g., id*. at 554. Because the defendant in *Strassini* received a favorable plea agreement, had not intended to go to trial but for the Rule 11 error, and the record revealed sufficient evidence of materiality of the scheme, he failed to demonstrate plain error. *Id*.

Here, defendant Jackson has never demonstrated any previous desire to go to trial. He pleaded guilty to an Information and received very substantial benefits from it. Indeed, the PSR calculated his offense level at 32, before subtracting 3 points for acceptance. PSR at ¶ 4. Thus, had the defendant gone to trial, he would have faced an advisory guidelines range of 121-151

months in the event of conviction (assuming no other charges or obstruction enhancement). By pleading guilty, Jackson initially received a sentence of 87 months, Dkt. 18, which was then reduced by over fifty percent, down to 40 months, for his cooperation at trial. Dkt. 28. This very substantial sentence reduction weighs strongly against the idea that Jackson would have gone to trial even had a *McDonnell* theory of defense been read aloud to him from the bench. Jackson's delay in bringing his own *coram nobis* petition until after this Court ruled regarding Jefferson further reveals the defendant's true lack of desire to risk anything, including trial, all along. Jackson's procedural default and his waiting such a lengthy period of time after *McDonnell* to bring his *coram nobis* petition were not about judicial economy. Rather, they evidence a strong desire to avoid subjecting himself to the type of scrutiny that the Fourth Circuit subjected the defendant to in *Strassini*, but yet to obtain at no risk the benefit of the proceedings regarding Jefferson, which were in a very different posture, with a bribe payee defendant – Congressman Jefferson.

## CONCLUSION

For the reasons stated in the government's Opposition brief and herein, defendant Jackson's Petition for Writ of *Coram Nobis,* and Vacatur of Conviction should be denied. The interests of justice are not served by vacating this defendant's conviction. *George*, 676 F.3d at

259 (denying *coram nobis* petition and stating that "[i]n the end, the writ is designed to do justice, not to facilitate a miscarriage of justice").

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


_____s/  Mark Lytle_____
Mark D. Lytle
  Assistant United States Attorney
Russell L. Carlberg
  Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Geremy C. Kamens
Federal Public Defender Va. Bar # 41596
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0848 (telephone)
(703) 600-0880 (facsimile)

Ann Mason Rigby
Assistant Federal Public Defender
*Pro hac vice*
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0869 (telephone)
(703) 600-0880 (facsimile) Ann_Rigby@fd.org (email)

*Counsel for Mr. Vernon Jackson*

                                                      ___s/ Mark D. Lytle_____
                                                      Mark D. Lytle
                                                      Assistant United States Attorney