IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Criminal No. 1:06-cr-161 |
| VERNON JACKSON, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

At issue in this matter is defendant's post-conviction petition, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), for a writ of *coram nobis* to vacate his convictions for bribery and conspiracy to commit bribery.

### I.

On May 3, 2006, defendant pled guilty to bribing and conspiring to bribe former United States Congressman William Jennings Jefferson to perform "official acts" for the benefit of defendant's company, iGate, Incorporated ("iGate") in violation of 18 U.S.C. § 371 and 18 U.S.C. § 201(b)(1)(A). Defendant was sentenced on September 8, 2006 to serve 60 months of incarceration on the conspiracy count and 87 months of incarceration on the bribery count, to run concurrently, and two years of supervised release on each count, also to run concurrently.

Defendant subsequently provided substantial cooperation in the government's investigation of Jefferson and also testified at trial against Jefferson with respect to seven bribery-related criminal charges.[1] A jury convicted Jefferson on each of these seven bribery-related charges, as well as additional bribery-related, racketeering, and conspiracy charges. Following his

---

[1] The bribery-related charges against Jefferson for which defendant provided testimony included two counts of solicitation of bribes, in violation of 18 U.S.C. § 201(b)(2)(A); two counts of self-dealing and bribery-related honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; and three counts of money laundering related to bribery, in violation of 18 U.S.C. § 1957.

1

conviction, Jefferson was sentenced to serve a total of thirteen years in prison. Jefferson appealed his convictions and sentences to the Fourth Circuit and the Supreme Court. The Fourth Circuit affirmed Jefferson's convictions and sentences,[2] and the Supreme Court denied certiorari. *United States v. Jefferson*, 674 F.3d 332, 369 (4th Cir. 2012), *cert. denied*, 568 U.S. 1041 (2012).

Based on defendant's cooperation in Jefferson's trial, the government filed a motion to reduce defendant's sentence, and defendant was re-sentenced to serve 40 months of incarceration. Defendant completed his sentence, including his two-year term of supervised release, on January 24, 2012.

Thereafter, in 2016—ten years after defendant pled guilty and nine years after Jefferson's trial—the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), "altered the legal landscape with respect to the principal element of bribery—the 'official act.'" *United States v. Jefferson*, 289 F. Supp. 3d 717, 721 (E.D. Va. 2017). In short, *McDonnell* held that an "official act" is a "decision or action [by a public official] on a 'question, matter, cause, suit, proceeding or controversy.'" *McDonnell*, 136 S. Ct. at 2371. The "question, matter, cause, suit, proceeding or controversy" must be "something specific and focused that is 'pending' or 'may by law be brought' before a public official" and must involve "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2372. And a "decision or action" on the "question, matter, cause, suit, proceeding or controversy" may include "using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.*

---

[2] The Fourth Circuit did reverse Jefferson's conviction with respect to one self-dealing and bribery-related honest services wire fraud count (which was not related to the iGate scheme) on the ground that the government had not established venue for that charge.

2

In light of *McDonnell*, Jefferson filed a *habeas corpus* petition pursuant to 28 U.S.C. § 2255 to vacate his bribery convictions on the ground that the Supreme Court's newly restricted definition of "official acts" meant that the activities for which he was convicted were not criminal. Specifically, Jefferson argued that he never engaged in or agreed to engage in "official acts," as defined by *McDonnell*. On October 4, 2017, Jefferson's petition was granted with respect to his bribery-related convictions arising from Jefferson's agreements with defendant and iGate because (i) the jury instructions in Jefferson's trial "did not convey 'meaningful limits' on the meaning of official act and 'lacked important qualifications, rendering them significantly overinclusive'"[3] and (ii) the evidence at trial did not establish "that Jefferson took 'official acts' in relation to the iGate scheme within the meaning of the bribery statute as clarified by the Supreme Court's opinion in *McDonnell*." *Id.* at 734–35, 740–41.[4]

Currently at issue is defendant's petition for a writ of *coram nobis* to vacate his bribery and conspiracy convictions, which defendant filed approximately two months after Jefferson's *habeas* petition was granted in part. In essence, defendant argues that the writ should be granted because the Supreme Court's clarification of the meaning of "official act" in *McDonnell* reveals that defendant did not plead guilty intelligently during his plea proceeding and that there was not a

---

[3] The bribery instruction regarding the definition of an official act that was provided to the jury in Jefferson's case was one that was long approved by the courts and that was based on the Supreme Court's nearly century-old decision in *United States v. Birdsall*, 233 U.S. 223 (1914). *See United States v. Jefferson*, 674 F.3d 332, 355–57 (4th Cir. 2012).

[4] Jefferson's *habeas* petition was denied with respect to one other bribery-related count associated with schemes in which Jefferson performed conduct for companies other than iGate because the trial evidence was sufficient to demonstrate that Jefferson engaged in "official acts" under the *McDonnell* test with respect to those schemes. *Jefferson*, 289 F. Supp. 3d at 743–44. Jefferson's *habeas* petition was also denied with respect to his convictions for conspiracy to violate the Foreign Corrupt Practices Act and for racketeering because the trial evidence was sufficient to support those counts and because those counts were not infected by the improper bribery instruction. Thus, following the grant of *habeas* relief, Jefferson was resentenced to serve five years, or time served, for the remaining valid convictions.

factual basis for his guilty plea. For the reasons that follow, defendant's petition for a writ of *coram nobis* must be granted.

## II.

The writ of *coram nobis*[5] is an ancient common-law remedy that was originally designed "to correct errors of fact" that "affect[ed] the validity and regularity of the judgment." *United States v. Morgan*, 346 U.S. 502, 507 (1954) (internal quotation marks omitted). In its modern-day form, the writ has a broader application and may "issue to redress a fundamental error" infecting "an earlier judgment of conviction." *United States v. Denedo*, 556 U.S. 904, 911, 917 (2009).[6] Yet, to ensure "that finality is not at risk in a great number of cases," the Supreme Court has "limit[ed] the availability of the writ to 'extraordinary' cases presenting related circumstances compelling its use 'to achieve justice.'" *Id.* (quoting *Morgan*, 346 U.S. at 511); *see also id.* at 916 ("[J]udgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases."). Indeed, it is well-settled that *coram nobis* may only be invoked to correct errors so fundamental that they "render the proceedings themselves irregular and invalid" and "result[] in a complete miscarriage of justice." *Bereano v. United States*, 706 F.3d 568, 577 (4th Cir. 2013) (quoting *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 n.3 (10th Cir. 2010) and *United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990)).

In particular, the Fourth Circuit has held that a petitioner seeking a writ of *coram nobis* "must show that (1) a more usual remedy is not available; (2) valid reasons exist for not attacking

---

[5] The Latin phrase *coram nobis* means "before us," referring to the sovereign. Black's Law Dictionary (10th ed. 2014). The writ's name stems from the fact that at common-law, *coram nobis* was a writ of error taken from a judgment of the King's Bench. *Id.* In contrast, the writ *coram vobis* ("before you"), was a writ of error taken from any court other than the King's Bench, such as the Court of Common Pleas. *Id.*

[6] As the Supreme Court has explained, "the authority [of a federal court] to grant a writ of *coram nobis* is conferred by the All Writs Act, which permits 'courts established by Act of Congress' to issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'" *Denedo*, 556 U.S. at 911 (2009) (quoting 28 U.S.C. § 1651(a)).

4

the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012) (internal quotation marks omitted). The Supreme Court has made clear that "[i]t is presumed the proceedings were correct and the burden rests on the accused to show otherwise." *Morgan*, 346 U.S. at 512.

## A.

*First*, it is clear, and the government does not contest, that defendant cannot seek relief through a more usual remedy instead of through a writ of *coram nobis*. Defendant cannot seek relief under the typical remedies for a direct or collateral attack of a federal judgment and sentence, such as *habeas corpus*, because he is no longer in custody and has already served his entire sentence of incarceration and supervised release. *See Akinsade*, 686 F.3d at 252 (citing 28 U.S.C. § 2255 (1948); 28 U.S.C. § 2241 (1948)). Thus, defendant has satisfied the first element necessary to grant a writ of *coram nobis*.

## B.

*Second*, defendant has provided valid reasons for not challenging his convictions earlier.[7] Under the well-settled understanding of the law, which had remained unaltered since 1914, defendant had no basis for attacking his convictions for bribing and conspiring to bribe Jefferson.[8] Indeed, in 2012, the Fourth Circuit affirmed Jefferson's bribery convictions on the ground that the jury was properly instructed on the meaning of "official acts" pursuant to *United States v. Birdsall*, 233 U.S. 223 (1914), and that Jefferson's acts fell within the *Birdsall* and statutory definition of

---

[7] As the Fourth Circuit has explained, "there is no there is no firm limitation of time within which a writ of *coram nobis* will lie." *United States v. Rocky Mountain Corp.*, 442 F. App'x 875, 876 (4th Cir. 2011).

[8] *See United States v. Jefferson*, 674 F.3d 332, 357 (4th Cir. 2012) (stating, in 2012, that the Supreme Court's interpretation of "official act" in *United States v. Birdsall*, 233 U.S. 223 (1914), "has never been overruled or called into question by the Supreme Court").

5

"official act." *United States v. Jefferson*, 674 F.3d 332, 355 (4th Cir. 2012). Then, in 2016, a decade after defendant pled guilty to bribery and conspiracy to commit bribery, the Supreme Court's decision in *McDonnell* changed the legal landscape with respect to the "official act" element of bribery. Defendant then filed his *coram nobis* petition only seventeen months after *McDonnell* was decided. Thus, the fact that the basis for defendant's challenge to his convictions emerged a reasonably short time before defendant filed his petition is a valid explanation for defendant's decision not to challenge his convictions earlier. *See Bereano v. United States*, 706 F.3d 568, 576 & n.9 (4th Cir. 2013) (concluding that a *coram nobis* petitioner had a valid reason for not attacking his convictions earlier because the Supreme Court decision on which the petitioner primarily relied was rendered only ten months before he filed the petition).

Moreover, it was also reasonable for defendant to wait until after Jefferson's § 2255 petition was resolved, which occurred only two months before defendant filed his petition, because the issues decided in Jefferson's collateral attack—*i.e.* whether Jefferson performed any "official acts" for defendant under the *McDonnell* test—are at the heart of defendant's *coram nobis* petition. Thus, by waiting to file his petition until after the resolution of Jefferson's *McDonnell*-based claims, defendant promoted judicial economy by ensuring the petition would not be frivolous.

In addition, to determine whether a *coram nobis* petition is timely, courts also consider whether the government has suffered prejudice as a result of the petitioner's delay in seeking *coram nobis* relief. *See Blanton v. United States*, 94 F.3d 227, 231 (6th Cir. 1996); *United States v. Darnell*, 716 F.2d 479, 481 (7th Cir. 1983); *United States v. Mora-Gomez*, 875 F. Supp. 1208, 1216 (E.D. Va. 1995). In this respect, it does not appear that the government has suffered prejudice as a result of defendant's failure to challenge his convictions earlier. Indeed, the government has not identified any evidence the government was unable to produce, and it appears that the

government was fully able to oppose defendant's *coram nobis* petition. Accordingly, in light of the sound reasons for defendant's delay in filing a *coram nobis* petition and the absence of significant prejudice to the government caused by the delay, defendant has satisfied the second *Akinsade* element required to support his petition.

### C.

*Third*, it is also apparent, and undisputed by the government, that defendant continues to face adverse consequences stemming from his convictions that are sufficient to satisfy the case or controversy requirement of Article III. Defendant's convictions deprive him of the right to exercise certain civil rights, including the right to vote or possess a firearm. A district court has also held defendant liable, on the basis of his guilty plea in the instant case, for civil conspiracy and breach of his fiduciary duty to iGate and ordered defendant to pay the plaintiffs in that matter $391,993.71. *Cadle v. Jefferson*, No. 3:07-CV-00070-CRS, 2017 WL 3013385, at *6, *15, *17 (W.D. Ky. July 14, 2017). In addition, as a result of defendant's convictions, iGate ceased its operations, closed its headquarters in Louisville, Kentucky and furloughed all of its employees, and iGate is no longer a going concern. *Id.* at *6. Lastly, defendant represents that despite continuing interest by potential lenders and investors in iGate's technology, defendant has not been able to obtain financing to bring the technology to market because of lenders' and investors' wariness of partnering with a convicted felon. These adverse consequences, stemming from defendant's convictions, are sufficient to create a controversy, as is required by Article III and the third *Akinsade* element.

### D.

*Fourth*, and lastly, defendant has demonstrated that the errors in his plea proceeding were of the most fundamental character. The Fourth Circuit has instructed that an error in the petitioner's prior criminal proceeding is sufficiently serious as to be an error "of the most fundamental

7

character" if the error "would have entitled [the petitioner] to relief by way of a direct appeal" and if *coram nobis* relief is "required in order to achieve justice." *Bereano*, 706 F.3d at 577; *United States v. Mandel*, 862 F.2d 1067, 1074–75 (4th Cir. 1988). Analysis thus proceeds in three steps: first, whether any errors infect defendant's prior criminal proceeding; second, whether those errors would have entitled defendant to relief on direct appeal; and third, whether the interests of justice require *coram nobis* relief.

1.

Defendant argues that two errors rendered his plea proceeding invalid. Specifically, defendant asserts that the Supreme Court's clarification of the meaning of the "official act" requirement under the bribery statute reveals that defendant's guilty plea was made unintelligently and without a factual basis

Rule 11, Fed. R. Crim. P., requires the trial court to "inform the defendant of, and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading guilty[.]" Fed. R. Crim. P. 11(b)(1)(G). In this respect, "[i]t is essential that the defendant receive notice of the true nature of the charge rather than a rote recitation of the elements of the offense." *United States v. Martinez*, 277 F.3d 517, 530 (4th Cir. 2002) (internal quotations and citations omitted). Similarly, the Due Process Clause of the Fifth Amendment requires a guilty plea to be "intelligent" to be constitutionally valid. *See Bousley v. United States*, 523 U.S. 614, 618 (1998); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). In order for a plea to be "intelligent," a criminal defendant must "first receive[] 'real notice of the true nature of the charge against him." *Bousley*, 523 U.S. at 618 (quoting *Smith*, 312 U.S. at 334). Accordingly, if "the record reveals that neither [the defendant], nor his counsel, nor the court correctly understood the essential elements of the crime with which [the defendant] was charged" in light of a subsequent Supreme Court decision

8

clarifying the elements of the crime, the defendant's guilty plea is constitutionally invalid. *Id.* at 618–19.

These principles, applied here, confirm that defendant's guilty plea was made unintelligently. During the plea colloquy, defendant was advised by the Court that in order for defendant to be guilty, the purpose of his agreements and inducements must have been to influence "official acts" of a public official. In this regard, defendant was advised in the plea colloquy about "official acts" in accordance with then-existing law; ten years later, *McDonnell* narrowed the meaning of "official acts." Thus, defendant was not informed that an "official act" referred to a United States public official taking action—or pressuring or advising another United States public official to do so—on a specific, pending matter that would involve a formal exercise of government power. *See McDonnell*, 136 S. Ct. at 2371–72. Thus, the plea colloquy reflects that defendant did not understand the true nature of the bribery-related crimes with which he was charged or the essential elements of those offenses, which were subsequently clarified by the Supreme Court. Accordingly, defendant's guilty plea was unintelligent and invalid under Rule 11 and the Fifth Amendment. *Bousley*, 523 U.S. at 618–19; *Martinez*, 277 F.3d at 530.

In addition, Rule 11 also requires the trial court to "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). This requirement "ensures that the court make clear exactly what a defendant admits to, and whether those admissions are factually sufficient to constitute the alleged crime." *Martinez*, 277 F.3d at 531 (internal quotations and citations omitted). The rule also serves the important function of "protect[ing] a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." Rule 11, Fed. R. Crim. P., Notes of Advisory Committee on Rules. The Supreme Court's decision in *McDonnell* makes clear that the facts admitted by

defendant in the Information and the Statement of Facts do not provide a factual basis for defendant's guilty plea to the charges of bribery and conspiracy to commit bribery of a public official, as required by *McDonnell*.

A defendant is guilty of bribing a public official if he "gives, offers or promises anything of value to any public official . . . with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A). Put simply, a "defendant completes the crime[] of . . . bribery as soon as he gives or offers payment in exchange for an official act." *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018). This is so even if the defendant and the public official do not have a "meeting of the minds about an official act" and even if the public official does not in fact perform the official act. *Id.* To be guilty of conspiring to bribe a public official, a defendant must agree with another person to give, offer or promise something of value to any public official with intent to influence any official act. *See* 18 U.S.C. §§ 201(b)(1)(A) and 371. Unlike the substantive bribery charge, conspiracy requires a mutual understanding among co-conspirators with respect to the object of the conspiracy as well as an overt act in furtherance of the conspiracy. *United States v. Cardwell*, 433 F.3d 378, 390 (4th Cir. 2005).

In pertinent part, the Information and Statement of Facts alleged the following facts, which defendant admitted were true at his plea hearing:

- Jefferson "provided official assistance to [defendant] in persuading the U.S. Army to test iGate's" technology. Jefferson's "official assistance ultimately led to iGate being placed on a U.S. General Services Administration . . . schedule, enabling iGate's products to be selected for use at the U.S. Army base at Fort Stewart in Georgia."
- Jefferson told defendant that he would "not continue to use [his] official position to help [defendant] and iGate secure business unless [defendant] agreed to pay" him through a nominee company.
- Defendant agreed that iGate would pay Jefferson's nominee company monthly payments of $7,500.00, 5% of gross sales over $5 million per year, 5% of all capital investments in iGate secured by Jefferson's nominee company, and options for 1 million shares of iGate

stock over a five-year period. These payments were "designed to be in return for" Jefferson "performing official acts in promoting iGate products and business."

- Defendant paid false invoices between January 2001 and August 2005 "to secure [Jefferson's] continued performance of official acts promoting iGate's business."

- Jefferson met with officials of Netlink Digital Television ("NDTV"), a Nigerian company, and suggested iGate's technology to NDTV. As a result, NDTV agreed to invest approximately $45 million in a business venture with iGate ("the Nigerian Deal"). Jefferson then "agreed to provide official assistance to the Nigerian Deal by using [his] official influence with Nigerian government officials to promote the business venture there." Defendant agreed to increase iGate's payments to Jefferson's nominee company from 5% to 35% of any profits derived by iGate for any business in Africa, knowing they were "in return for [Jefferson's] performance of official acts to further the iGate business" in Nigeria. Jefferson took similar steps to promote iGate to Nigerian, Ghanaian, and other African officials, including some that defendant specifically requested.

- Jefferson "introduced [defendant] and NDTV officials" to personnel at the Ex-Im Bank, the official export credit agency of the United States, "for the purpose of promoting" a Nigerian iGate deal, and "met with officials at the Ex-Im Bank . . . to further promote financing for" a Nigerian iGate deal, and "to promote" a Ghanaian iGate deal.

- Defendant helped "sponsor and pay for" Jefferson's trips to various nations in Africa "for among other purposes, to promote iGate and its business opportunities there." "[W]hile there," Jefferson "officially [met]" with African officials, including a meeting that Jefferson's staff arranged with the help of U.S. Embassy staff, and corresponded with some Nigerian officials on congressional letterhead.

- Jefferson used a member of his congressional staff "to expedite the processing of required visas and passports" for individuals travelling on one of these trips.

- Between January 2001 and August 2005, defendant "caused approximately 30,775,000 shares of Class A iGate common stock (24% of iGate's Issued Class A shares)" as well as payments totaling $455,446.00 to be transferred to Jefferson's nominee company "in return for official acts performed by [Jefferson] to further the iGate business."

*United States v. Jackson*, 1:06-cr-00161-TSE, Information, ECF No. 4, and Statement of Facts, ECF No. 6 (E.D. Va., May 3, 2006).

For the reasons stated in the Memorandum Opinion granting Jefferson's § 2255 petition with respect to the bribery counts associated with the iGate scheme, and briefly summarized here, none of the above actions taken by Jefferson for the benefit of defendant and iGate constitutes an "official act," as defined by *McDonnell*. *Jefferson*, 289 F. Supp. 3d at 740. *First*, Jefferson's meetings with officers from the U.S. Army were not official acts because Jefferson did not

11

"pressure[]" the officers to test iGate products; Jefferson merely "[s]et[] up a meeting" and "talk[ed] to another official." *Id.* at 736–37 (quoting *McDonnell*, 136 S. Ct. at 2359, 2371). *Second*, Jefferson's numerous meetings with African officials did not qualify as official acts because "the bribery statute does not criminalize pressuring foreign officials to perform official acts; the bribery statute defines a public official to include only officials of the U.S. government." *Id.* at 737–38 (citing 18 U.S.C. § 201(a)(1)). *Third*, Jefferson's decisions to travel to various African company and lead a privately sponsored trade delegation on behalf of iGate were not official acts because these decisions did "not 'involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee,'" and were more akin to "'organizing an event' for the purpose of promoting constituent interests." *Id.* at 738 (quoting *McDonnell*, 136 S. Ct. at 2370).[9] *Fourth*, Jefferson's efforts to convince State Department officials at the U.S. Embassy to grant visas for individuals travelling as part of the iGate deal did not constitute official acts because Jefferson did not "exert pressure" on State Department officials, but merely "express[ed] support" for the visa applications. *Id.* at 738–39 (quoting *McDonnell*, 136 S. Ct. at 2359, 2371). *Fifth*, and lastly, Jefferson's efforts to secure Ex-Im Bank financing for iGate's joint ventures were not official acts because Jefferson did not "exert pressure" on Ex-Im Bank officials; rather, Jefferson "arrang[ed] meetings," "ma[de] introductions and express[ed] support." *Id.* at 739–40 (citing *McDonnell*, 136 S. Ct. at 2370–71). In sum, the actions taken by Jefferson on behalf of iGate and in return for payment by defendant were not official acts, but rather were "'constituent services' and other activities that were not criminal." *Id.* at 740.

---

[9] The fact that Jefferson was a member of House caucuses that promote trade in West Africa did not alter this conclusion because "promoting trade is too general to be a matter pending before a public official, just as 'promoting business in Virginia' was too general in *McDonnell*." *Jefferson*, 289 F. Supp. 3d at 738 (citing *McDonnell*, 136 S. Ct. at 2359).

12

Importantly, that Jefferson did not in fact perform any official acts for defendant does not end the analysis. As explained above, as the bribe payor, defendant's guilt under the bribery statute turns on whether he gave or offered to give anything of value to Jefferson "*with intent* . . . to influence any official act" by Jefferson. 18 U.S.C. § 201(b)(1)(A) (emphasis added). And under the conspiracy statute, defendant is guilty of conspiring to bribe Jefferson if defendant and his co-conspirators agreed to violate the bribery statute and committed an overt act. *See Cardwell*, 433 F.3d at 390 (citing 18 U.S.C. § 371).

Yet, at the same time, the fact that Jefferson did not perform official acts clearly is strong evidence that defendant did not make payments to Jefferson with the intent to influence official acts and did not conspire to do so. Indeed, given that defendant continued to pay Jefferson over a period of time during which Jefferson performed only non-criminal and non-official "constituent services" for iGate, it appears that defendant paid Jefferson with the understanding and intent that such payments would be made in exchange for acts by Jefferson that are not criminal under *McDonnell*. Therefore, in the absence of other evidence reflecting a criminal intent, the fact that Jefferson did not perform official acts demonstrates that defendant did not give, offer, or promise anything of value to Jefferson, or conspire to do so, with the intent to influence official acts.

Seeking to avoid this conclusion, the government argues that even if Jefferson did not perform official acts for defendant and iGate, two statements made by defendant during his testimony at Jefferson's trial, which occurred after defendant's plea hearing, reflect that defendant did intend to influence official acts by Jefferson. Even assuming, *arguendo*, that this subsequent testimony by defendant is relevant to whether there was a factual basis for defendant's guilty plea, the government's argument fails because defendant's testimony does not demonstrate that defendant intended to influence official acts.

13

Defendant's first statement, made in reference to Jefferson's meeting with U.S. Army officers, which occurred before defendant agreed to pay Jefferson, was that "I watched him give orders, if you will, to a United States general . . . I just watched him be so effective for me, and he . . . [had] as much zeal as I did." This statement does not establish that defendant paid Jefferson in exchange for official acts. Defendant's characterization of Jefferson's conduct as "giv[ing] orders, if you will, to a United States general" is clearly a loose—not literal—description. Moreover, the Statement of Facts to which defendant admitted and the evidence at Jefferson's trial demonstrates that what defendant actually witnessed Jefferson do was "ma[ke] several encouraging statements about iGate's technology" and "persuad[e] the U.S. Army to test iGate's . . . technology." *Jefferson*, 289 F. Supp. 3d at 737; *Jackson*, 1:06-cr-00161-TSE, Statement of Facts, ECF No. 6. Defendant's obviously loose characterization of what transpired during this meeting, uttered seven years after the meeting occurred, is insufficient to demonstrate that defendant misperceived what Jackson had actually done. Thus, it is clear that Jefferson's meeting with U.S. Army officers did not cause defendant to believe that Jefferson actually had done or would continue to do acts tantamount to giving binding orders or otherwise exerting pressure on other public officials in exchange for payments to Jefferson. Indeed, to the extent that Jefferson's meeting with U.S. Army officers framed defendant's expectation going forward, it shows that defendant paid Jefferson in exchange for persuasion, not official pressure.

The government also highlights defendant's statement at Jefferson's trial that "I believed when I called upon [Jefferson] to help, he would help, because I was paying him to help." Although this statement reflects that defendant expected some kind of help in return for his payments, it does not show that defendant's payments were made in exchange for official acts. *See United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (explaining that a payment "given simply with the

'generalized hope or expectation of ultimate benefit on the part of the donor,' does not constitute a bribe") (quoting *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980)). Indeed, the better evidence, namely the actions that Jefferson in fact performed for iGate in return for defendant's continued payment, demonstrates that the "help" defendant paid Jefferson to perform was non-official "constituent services" that are not criminal under *McDonnell*.

Accordingly, the facts alleged in the Indictment and the Statement of Facts, along with the evidence adduced at Jefferson's trial, reflect that there was not a factual basis for defendant's guilty plea to the charges of bribery of a public official and conspiracy to bribe a public official.[10] Defendant's guilty plea was thus accepted in error and in violation of Rule 11.

## 2.

Before resolving the second step in the fundamental error analysis—*i.e.* whether these errors would have entitled defendant to relief on direct appeal—it is necessary to determine what standard of review would have applied to defendant's claim on appeal. Under Rule 11(h), Fed. R. Crim. P., "errors in plea proceedings are normally evaluated under a harmless error standard." *Martinez*, 277 F.3d at 524 (citing Rule 11(h), Fed. R. Crim. P.). Yet importantly, a defendant who asserts a Rule 11 error for the first time on appeal, without raising an objection or seeking to withdraw his plea before the trial court, must show plain error under Rule 52(b), Fed. R. Crim. P. *United States v. Vonn*, 535 U.S. 55, 58 (2002); *Martinez*, 277 F.3d at 524. Thus, because defendant did not raise an objection or move to withdraw his plea during the underlying proceeding before

---

[10] The government also argues that the fact that defendant paid Jefferson such a large amount of money and iGate stock demonstrates that defendant must have been paying Jefferson in exchange for official acts and not merely in exchange for persuasion, influence, and promotion of iGate's business. Although this argument has some force, the evidence at trial revealed that Jefferson's non-official actions on behalf of iGate were very lucrative for defendant and resulted in significant business gains for iGate. Thus, the fact that defendant paid Jefferson a large amount of money in return for his services, without more, does not establish that defendant made those payments in exchange for "official acts."

15

this Court on the grounds that his plea was unintelligent or that there was not a sufficient factual basis for his guilty plea,[11] defendant would be tasked with demonstrating plain error on appeal.[12]

Under Rule 52(b)'s plain error standard, a reviewing court may correct a forfeited error "only if (1) there is 'an error,' (2) the error is 'plain,' and (3) the error 'affect[s] substantial rights.'" *Henderson v. United States*, 568 U.S. 266, 272 (2013) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). In addition, because granting relief under Rule 52(b) is discretionary, not mandatory, the reviewing court should determine if relief is warranted by considering (4) "whether

---

[11] The government argues that as a result of defendant's failure to raise his Rule 11 and Fifth Amendment claims during his plea proceeding, defendant has "procedurally defaulted." Thus, the government asserts, defendant is required to demonstrate "cause" and "actual prejudice" or "actual innocence" in order to raise these claims now in support of his *coram nobis* petition. This argument fails because the Fourth Circuit has never required a *coram nobis* petitioner to satisfy every requirement for *habeas corpus* relief. *Bereano*, 706 F.3d at 576 n.10 (noting that prior Fourth Circuit decisions concerning the availability of *coram nobis* did not "utilize[] habeas corpus procedures in resolving coram nobis petitions"). To the contrary, the Fourth Circuit has consistently required a *coram nobis* petitioner to satisfy only the four *Akinsade* elements. Indeed, as courts have sensibly concluded, there are at least two reasons that it is inappropriate to apply *habeas* procedural principles to *coram nobis* petitions: "(i) the gates to *coram nobis* relief are already protected by significant hurdles, such as the requirement that the error be a fundamental one, and (ii) few federal prisoners will desire to wait until their sentence of imprisonment is complete to launch a judicial attack on their conviction." *United States v. Mora-Gomez*, 875 F. Supp. 1208, 1216 n.10 (E.D. Va. 1995) (citing *United States v. Darnell*, 716 F.2d 479, 481 n.5 (7th Cir. 1983)).

In any event, if necessary, defendant would be able to demonstrate cause and prejudice because (i) the legal basis of his claim was not reasonably available to defendant at the time of his direct appeal and (ii) defendant would not have pled guilty but for the errors. *See Strickler v. Greene*, 527 U.S. 263, 289 (1999); *Reed v. Ross*, 468 U.S. 1, 16 (1984).

[12] This conclusion is not undermined by the fact that the legal basis for determining that defendant's guilty plea was infirm, *i.e.* the *McDonnell* decision, did not exist until after defendant's proceeding before this Court had concluded. This point is illustrated by the Fourth Circuit's analysis in *United States v. Stewart*, 256 F.3d 231, 251 (4th Cir. 2001). There, a defendant argued, for the first time on appeal, that his conviction and sentence were invalid under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which was decided during the pendency of his appeal. *Stewart*, 256 F.3d at 251. The Fourth Circuit concluded that because the defendant raised his *Apprendi* argument for the first time on appeal he was required to demonstrate plain error, despite the fact that the defendant did not have the benefit of *Apprendi* during his proceeding before the district court. *Id.* The Fourth Circuit's decision in *United States v. Mandel*, 862 F.2d 1067 (4th Cir. 1988) is also helpful in this regard. There, the petitioners for *coram nobis* argued that their mail fraud convictions should be vacated based on the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), which held—in a decision issued five years after the completion of petitioners' sentences—that the mail fraud statute does not protect against schemes to defraud persons of their intangible rights such as the right to honest government. *McNally*, 483 U.S. at 1071. Importantly, the *Mandel* petitioners had argued at multiple points during their trial and pretrial proceedings that the mail fraud statute does not punish the deprivation of intangible rights. *Id.* at 1069–70. Thus, the Fourth Circuit in *Mandel* determined that, on review of the petition for *coram nobis*, the petitioners needed to satisfy only harmless error review because the petitioners had raised the same objection to their convictions before the trial court as they were now raising in their *coram nobis* petition. *Id.* at 1073. Accordingly, these cases confirm that because defendant here did not raise his Rule 11 and Fifth Amendment objections during his underlying proceeding, he would be required to show plain error on direct appeal and thus must satisfy the plain error standard on review of his *coram nobis* petition.

'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 736) (internal quotation marks omitted).

First, as already explained, *supra* part II.D.1, there were two errors in defendant's plea proceeding: (i) defendant did not plead intelligently, in violation of Rule 11 and the Fifth Amendment, and (ii) there was not a factual basis for defendant's guilty plea, in violation of Rule 11. And, second, it is also clear that these errors are "plain." As the Fourth Circuit has explained, "[a]n error is plain under *Olano* if, at the time of appeal, 'the settled law of the Supreme Court or this circuit establishes that an error has occurred.'" *Martinez*, 277 F.3d at 532 (quoting *United States v. Promise*, 255 F.3d 150, 160 (4th Cir. 2001) (en banc)). Thus, because the Supreme Court's clarification of the definition of an "official act" in *McDonnell* establishes that defendant did not plead guilty either intelligently or with a proper factual basis, these errors are "plain."

With respect to the third *Olano* element, the Fourth Circuit has made clear that "[i]n the guilty plea context, an error affects a defendant's substantial rights if he demonstrates a reasonable probability that he would not have pled guilty but for the error." *United States v. Garcia*, No. 15-4227, 2016 WL 212504, at *1 (4th Cir. Jan. 19, 2016) (citing *United States v. Massenburg*, 564 F.3d 337, 342 (4th Cir. 2009)). Here, it is reasonably probable that defendant would not have pled guilty if he had correctly understood the official act requirement, as clarified by *McDonnell*, and if the Court had found there was not a factual basis for his guilty plea. To be sure, defendant's guilty plea enabled defendant to cooperate with the government and thus to obtain a significant downward departure in his sentence. Yet, as already discussed, the evidence that defendant had bribed and conspired to bribe Jefferson in exchange for official acts was not strong. Thus, it is highly likely that, had defendant understood the true nature of the charges against him and the lack

17

of a factual basis for his guilty plea, as subsequently elucidated by *McDonnell*, defendant would have proceeded to trial.

Lastly, *Olano* makes clear that a reviewing court should exercise its discretion to grant plain error review "in those circumstances in which a miscarriage of justice would otherwise result." *Olano*, 507 U.S. at 736 (internal quotations omitted). In this respect, "it is well-settled that a 'conviction and punishment [ ] for an act that the law does not make criminal . . . inherently results in a complete miscarriage of justice.'" *Jefferson*, 289 F. Supp. 3d at 730 (quoting *Davis v. United States*, 417 U.S. 333, 346–47 (1974)). Indeed, as already discussed, defendant was convicted for conduct that *McDonnell* makes clear was neither bribery nor conspiracy to commit bribery. Thus, circumstances clearly exist here to warrant discretionary plain error review.

Accordingly, because all four *Olano* factors are satisfied, defendant has demonstrated plain error in his plea proceeding, and thus defendant would be entitled to relief on direct appeal.

### 3.

The final step in the fundamental error analysis is to consider whether relief under the writ of *coram nobis* is "required in order to achieve justice." *Mandel*, 862 F.2d at 1074–75 (4th Cir. 1988). As already noted, correcting the errors in defendant's plea proceeding, which resulted in defendant's conviction and punishment for conduct that is not criminal under the bribery statute as clarified by the Supreme Court in *McDonnell*, is necessary to avoid "a complete miscarriage of justice." *Jefferson*, 289 F. Supp. 3d at 730 (quoting *Davis*, 417 U.S. at 346–47). Indeed, the Fourth Circuit has long recognized that *coram nobis* relief is appropriate in circumstances where a retroactive change in the law makes clear that a formerly convicted defendant is not guilty.[13] *See*

---

[13] The *McDonnell* decision applies retroactively because it is a "new 'substantive' rule" that "narrow[s] the scope of a criminal statute by interpreting its terms," namely 18 U.S.C. § 203(a)'s definition of "official act." *Jefferson*, 289 F. Supp. 3d at 731 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004)).

*Mandel*, 862 F.2d at 1075. Accordingly, *coram nobis* relief is certainly necessary in order to achieve justice in this case.

4.

In sum, because defendant has demonstrated error in his plea proceeding that would have entitled him to relief on direct appeal, and because *coram nobis* relief is necessary to achieve justice, defendant has established error "of the most fundamental character," in satisfaction of the fourth and final *Akinsade* element required to grant the writ of *coram nobis*.

### III.

As noted in *Jefferson*, 289 F. Supp. 3d at 744, to hold that defendant is not guilty of violating the bribery statute in these circumstances is not to express approval of his conduct, which appears to be corrupt; defendant paid Jefferson, a Congressman, and his family large sums of money for the Congressman to exert his influence on behalf of defendant's business interests.[14] Indeed, although defendant's conduct, namely paying a public official and his family large sums of money in exchange for that public official's promotion of defendant's private business interests, does not fall within the scope of the bribery statute, such conduct is clearly detrimental to the effective and fair operation of our democratic, representative government and undermines public trust of elected officials. Yet, in light of the Supreme Court's new interpretation of the bribery statute in the *McDonnell* decision, defendant is entitled to a writ of *coram nobis* and his convictions must be vacated. It is for Congress to consider whether the law should be clarified so that large

---

[14] Nor does this Memorandum Opinion hold that defendant was factually innocent of crime altogether. The government chose to have defendant plead guilty only to bribery and conspiracy to commit bribery and did not seek a guilty plea on any other charge or basis. But nothing in this Memorandum Opinion should be read as deciding that other aspects of defendant's activity did not constitute criminal conduct. All that is before the Court is whether defendant is entitled to a writ of *coram nobis* with respect to his convictions under the bribery statute, and in light of the Supreme Court's narrow reading of "official act," it is necessary to conclude that he is.

payments to public officials for certain services, such as the services provided by Jefferson to defendant in this case, should fall within the scope of the bribery statute.

Accordingly, for the reasons stated above, defendant has satisfied all four requirements that a petitioner must meet to authorize the district court to grant the writ of *coram nobis*. See *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012).

An appropriate order will issue.

Alexandria, Virginia
March 27, 2019

/s/
_____
T. S. Ellis, III
United States District Judge